# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT CLAIR COCHRAN, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>GREGORY KUPCHELLA, )<br>*Corrections Officer/Cert Leader*, )<br>JOHN PREBISH, JR., *Warden*, and )<br>LIAM ANDERSON, *Corrections* )<br>*Officer/Cert Team*, )<br>)<br>Defendants. ) | Civil Action No. 14 – 199J<br><br>Magistrate Judge Lisa Pupo Lenihan<br><br>ECF No. 29 |

## MEMORANDUM OPINION

Plaintiff, Robert Clair Cochran ( "Plaintiff"), commenced this action on September 17, 2014, by submitting a Motion for Leave to Proceed *in forma pauperis* (ECF No. 1) and a proposed Complaint (ECF No. 1-2), which was filed pursuant to 42 U.S.C. § 1983. His Motion was granted and his Complaint was docketed on September 18, 2014. (ECF Nos. 2, 3.) Plaintiff then filed an Amended Complaint on October 6, 2014. (ECF No. 6.) In his Amended Complaint, Plaintiff alleges that Defendants John Prebish, Jr. ("Prebish"), Warden at the Cambria County Prison; Gregory Kupchella ("Kupchella") Correctional Officer and CERT team leader; and Liam Anderson ("Anderson"), Correctional Officer and CERT team member, violated his rights under the Fourth and Eighth Amendments to the United States Constitution.

On March 27, 2015, Defendants filed a Motion for Summary Judgment ("the Motion") (ECF No. 29) with a Brief in Support thereof (ECF No. 30), and Plaintiff filed a response in

1

opposition thereto (ECF No. 36) on May 18, 2015. The Motion is now ripe for review, and, for the following reasons, it will be granted and judgment will be entered in favor of the Defendants.

### A. Factual Background

Plaintiff's claims stem from an incident that occurred while he was detained as a parole violator at the Cambria County Prison on July 20, 2014. On this day, Plaintiff was in the Disciplinary Housing Unit ("DHU") due to misconduct charges for matters that occurred five days earlier. (Defs.' Exh. A, ECF No. 29-1 at p.14.) Plaintiff and another inmate, James ("Jimmy") Claar ("Claar") were housed in the DHU in Cell 39. Id. at p.30. According to an Incident Report, Cell 39 was needed for another inmate, so Plaintiff and Claar were asked to "cuff up" and move to Cell 34. Id. However, both inmates refused orders to cuff up issued by Officer Baker and Lieutenant Kessler.[1] Id. Plaintiff states that he was never "ordered" to move but admits that he refused to move when told he "had to" by the officers. (Pl.'s Resp. in Opp'n to Mot. for Summ. J., ECF No. 36 at p.3, ¶ 7.)

According to Lieutenant Kessler, Plaintiff stated that "he was going to use force and get physical toward staff" if they tried to move him. (ECF No. 29-1 at p.30.) Therefore, he informed Deputy Warden Smith of the situation who then ordered that both Claar and Plaintiff be placed on security risk status and then placed back into Cell 39. Id.[2]

---

[1] Inmates in the DHU are required to be belted and handcuffed before the cell door can be opened. Id. at p.51.

[2] Cambria County Prison Policy & Procedure defines a "security risk" inmate as one who poses "a heightened security and/or safety threat." Id. at p.52. When an inmate is placed on security risk status, all items are removed from that inmate's cell/possession and the only county issued items the inmate is permitted to have in their possession, at least for the first forty-eight hours, are a gown, security risk toothbrush, mattress, pillow, pillowcase, two sheets and toilet paper on an as-needed basis. Id. After forty-eight hours, barring no additional misconducts, inmates are allowed undershorts, socks and shoes. Id.

The Correctional Emergency Response Team (hereinafter referred to as "CERT team") was assembled in order to perform the cell extraction of Plaintiff and Claar. Defendants submitted a DVD that contains video and audio of the cell extraction, which is described in detail in section C subsections 3 and 4, *infra*. (Defs.' Ex. B, ECF No. 29-2.) Following the cell extraction, Plaintiff was placed on security risk status and charged with the following misconduct charges:

>   111     Assault on staff or visitors; Attempting to cause or threatening bodily harm to staff or visitors;
> 
>   204     Interfering with a staff member in the performance of their duties; and
> 
>   209     Refusing to obey a staff members' order, and/or delayed compliance of the order.

(ECF No. 29-1 at p.9.) On July 29, 2014, Plaintiff was found guilty of Charges 204 and 209 but not guilty of Charge 111. Id. at p.13. He was sanctioned to time in the DHU from August 14, 2014, to September 1, 2014. Id. Plaintiff was subsequently transferred to the State Correctional Institution from the Cambria County Prison on October 31, 2014. Id. at p.7.

**B. Summary Judgment Standard**

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims. Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir.2007); UPMC Health System v. Metropolitan Life Ins. Co., 391 F.3d 497, 502 (3d Cir.2004).

The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(e); Williams v. Borough of West Chester, Pa., 891 F.2d

458, 460-61 (3d Cir.1989) (the non-movant must present affirmative evidence—more than a scintilla but less than a preponderance-which supports each element of his claim to defeat a properly presented motion for summary judgment). The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. Celotex, 477 U.S. at 322. *See also* Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir.2001). The non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." Garcia v. Kimmell, 381 F. App'x 211, 213 (3d Cir.2010) (quoting Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir.2005)).

When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). *See also* El v. SEPTA, 479 F.3d 232, 238 (3d Cir.2007). Importantly, however, in a case such as this one where there is a video recording of the incidents in question, the court need not adopt the non-movant's version of the facts if the recording "blatantly contradict[s]" the non-movant's version "so that no reasonable jury could believe it." Scott v. Harris, 550 U.S. 372, 380 (2007). Instead, the court should view the facts in the light depicted by the videotape. Id. at 380-81.

Because Plaintiff is proceeding *pro se*, the Court is required to liberally construe his pleadings. Haines v. Kerner, 404 U.S. 519, 520 (1972). Nonetheless, this does not require the

4

Court to credit his "bald assertions" or "legal conclusions." Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir.1997). Thus, for example, mere allegations, without support, are insufficient. Rather, the allegations must be supported by evidence, which the Court will evaluate under the standard described above to determine if there is merit beyond mere conclusions.

### C. Discussion

#### 1. Claims against CO Liam Anderson

Plaintiff has sued CO Liam Anderson, but according to Cambria County Office of Human Resources records, Liam Anderson did not begin his employment with Cambria County until July 28, 2014, eight days after the incident at issue herein. (Defs.' Exh. A, [ECF No. 29-1 at p.1](#).) Incident reports indicate that it was Officer Mark Anderson who was involved in the CERT operation on July 20, 2014, and was responsible for manning the E-bid shield (Electronic Body Immobilization Device) during the extraction. Id. at p.36. Thus, it appears that Plaintiff mistakenly named the wrong officer as a defendant in this matter.

For a defendant to be liable in a civil rights action, he or she must have personal involvement in the alleged wrongdoing. *See* Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) ("A defendant in a civil rights action must have personal involvement in the alleged wrongs . . . .") (citing Parratt v. Taylor, 451 U.S. 527, 537 n.3 (1981)). Liam Anderson was not personally involved in the cell extraction because he was not working at the Cambria County Prison at that time. Therefore, he will be dismissed from this action with prejudice.

The Court notes that even if Plaintiff had named the correct defendant, Mark Anderson, or moved to amend his complaint in order to correct the mistake of identify,[3] summary judgment would still be proper because, as explained below, there are no genuine issues of material fact as to whether Plaintiff's rights were violated by any member of the CERT team during the cell extraction. Therefore, this mistake is of no actual significance.

### 2. Claims against Warden John Prebish, Jr.

Although Plaintiff has named him as a defendant in this matter, there are no allegations in Plaintiff's Amended Complaint against Warden John Prebish, Jr., except for Plaintiff's identification of him as a defendant. *See* ECF No. 6 at ¶ 4 (". . . . He [Prebish] is legally responsible for the operation of Cambria County Prison, ND [sic] FOR THE WELFARE OF ALL INMATES at the Cambria County Prison.")

As previously stated, a plaintiff must demonstrate a defendant's "personal involvement in the alleged wrongs," and liability cannot be predicated on a theory of *respondeat superior*. *See* Rode, 845 F.2d at 1207 (citing Parratt, 451 U.S. at 537 n.3). A plaintiff makes sufficient allegations of a defendant's personal involvement by describing the defendant's participation in or actual knowledge of and acquiescence in the wrongful conduct. Id. Although the court can infer that a defendant had contemporaneous knowledge of wrongful conduct from the circumstances surrounding a case, the knowledge must be actual, not constructive. Baker v. Monroe Twp., 50 F.3d 1186, 1194 (3d Cir. 1995). A plaintiff "must portray specific conduct by

---

[3] Although Plaintiff likely learned about this mistake during the discovery process, he never advised the Court that he had named the wrong party. Once he realized his mistake, Plaintiff should have filed a motion to amend his complaint substituting Officer Mark Anderson for Officer Liam Anderson. Furthermore, because the statute of limitations in this action has not yet expired, an amended complaint would have been considered timely. *See* Bougher v. Univ. of Pittsburgh, 882 F.2d 74, 79 (3d Cir. 1989) (a claim filed under section 1983 is subject to Pennsylvania's two-year statute of limitations applicable to personal injury actions).

state officials which violates some constitutional right." Gittlemacker v. Prasse, 428 F.2d 1, 3 (3d Cir. 1970).

Based on the complete lack of factual allegations against Warden Prebish in Plaintiff's Amended Complaint, the Court believes that Plaintiff's claims against him are impermissibly predicated on a *respondeat superior* theory of liability. Plaintiff has not alleged any facts that would indicate Warden Prebish took part in the alleged wrongdoing or even knew that the CERT team was called in to extract Plaintiff and Claar from the cell. In fact, Plaintiff alleges that it was Deputy Warden Smith who was contacted regarding Plaintiff's refusal to move cells and that it was Deputy Smith who authorized the CERT operation and Plaintiff's placement on security risk. It is evident that Plaintiff named Warden Prebish as a defendant simply by virtue of his supervisory position, which, by itself, is insufficient to establish personal involvement in wrongdoing. Because Plaintiff cannot predicate liability on a theory of *respondeat superior*, Warden Prebish is entitled to summary judgment as a matter of law.

### 3. **Fourth Amendment Claim**

Plaintiff claims that his rights under the Fourth Amendment were violated but it is not clear whether he alleges a claim for an unreasonable search of his cell or person. Plaintiff simply alleges that the "abuse", "pain", and "humiliation" he suffered violated his Fourth Amendment right to be free from unreasonable searches and seizures. ([ECF No. 6 at p.3](#).) Apart from this bald assertion, there are no factual allegations in the Amended Complaint regarding the legitimacy of the unspecified search at issue. Regardless, his claim for any violation of his Fourth Amendment rights fails as a matter of law.

The United States Supreme Court has stated unequivocally that "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell.

7

The recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions." Hudson v. Palmer, 468 U.S. 517, 526 (1984). Therefore, if Plaintiff is claiming that the search of his cell following the cell extraction was "unreasonable" then this does not constitute a viable Fourth Amendment claim.

If, on the other hand, Plaintiff is claiming that the search of his person, specifically the strip search that occurred following the cell extraction, was an unreasonable search of his body in violation of the Fourth Amendment, the evidence of record does not support this claim. The Supreme Court has held that inmates do not have a Fourth Amendment right to be free of strip searches, which may be conducted by prison officials without probable cause provided that the search is conducted in a reasonable manner. Bell v. Wolfish, 441 U.S. 520, 558 (1979) (holding that a prison rule requiring pretrial detainees to expose their body cavities for visual inspection as part of a strip search conducted after every contact visit with a person from outside the facility did not violate the Fourth Amendment). The Bell Court stated that reasonableness must be determined by balancing the need for the search against the invasion of personal rights, as revealed by four factors: "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Id. at 559. The video evidence dispels any notion that the strip search conducted in this case was unreasonable. Plaintiff's complaint that he was "humiliated" because he had to endure nudity in a cell with another man for 48 hours does not constitute a Fourth Amendment violation. *See* Rhodes v. Chapman, 452 U.S. 337, 349 (1981) (the United States Constitution does not mandate that prisons which house prisoners convicted of serious crimes must be completely free of discomfort and affronts to a prisoners' dignity).

#### 4. **Eighth Amendment Claim**

Plaintiff claims that he was subjected to excessive force during the cell extraction that occurred on July 20, 2014. Under the Cruel and Unusual Punishments Clause of the Eighth Amendment, inmates are protected against the "unnecessary and wanton infliction of pain." Whitley v. Albers, 475 U.S. 312, 319 (1986). In the context of an excessive force claim, the core judicial inquiry of whether the measure taken inflicted unnecessary and wanton pain and suffering is that set out in Whitley: "whether force was applied in a good-faith effort to maintain and restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 7 (1992). Although the Eighth Amendment protects inmates against cruel and unusual punishment, it "does not protect an inmate against an objectively *de minimis* use of force." Smith v. Mensinger, 293 F.3d 641, 648 (3d Cir. 2002). Not "every malevolent touch by a prison guard gives rise to a federal cause of action." Hudson, 503 U.S. at 9.

In determining whether a correctional officer has used excessive force in violation of the Eighth Amendment, courts look to several factors including: "(1) the need for the application of force; (2) the relationship between the need and the amount of force used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them; and (5) any efforts to temper the severity of the forceful response." Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir.2000) (internal quotations and citation omitted). The extent of any injuries that an inmate suffers is relevant, but "does not end" this analysis. Hudson, 503 U.S. at 7. Consideration of these factors permit a court to make inferences concerning "whether the use of force could plausibly have been thought necessary" or whether the circumstances show "such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." Whitley, 475 U.S. at

9

321 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.1973)).  "Summary judgment in favor of a defendant is not appropriate if it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain." Brooks, 204 F.3d at 106 (citing Whitley, 475 U.S. at 322.)

### a. Need for application of force

With regard to the first factor, the Court finds that physical force was necessary in order to compel Plaintiff's compliance with the officers' orders.  It is not disputed that the cell extraction was ordered because Plaintiff and Claar refused to move cells.  What is disputed is whether the cell extraction was necessary.  According to Lieutenant Kessler, the inmates not only refused to move, but they also threatened to physically harm anyone who entered and tried to remove them from their cell.  In fact, following the cell extraction Plaintiff was charged in a Misconduct with "attempting to cause or threatening bodily harm to staff."  However, this charge was later dismissed due to lack of supporting evidence, and, according to Plaintiff, he never made such threat to Lieutenant Kessler.  Despite this fact, it is still undisputed that the inmates refused to cuff up and move from the cell.  Therefore, the cell extraction order appears to have been appropriate under the circumstances.

Whether the cell extraction was necessary when the CERT team arrived at the cell is a separate issue that is disputed by the parties.  Plaintiff contends that they were never given an opportunity to comply with Lieutenant Kessler's previous order to cuff up and move.  He states that when the CERT team arrived at their cell Officer Kupchella just immediately started screaming for them to "get away from the door."  Claar screamed back that they would cuff up, but Officer Kupchella continued to scream at them to "get away from the door."  The video

supports Plaintiff's account of what happened apart from the fact that someone is overheard screaming at the CERT team to "go away". It is not known who made this statement.

Plaintiff complains that the cell extraction was not necessary because they were willing to cuff up and they told this to the CERT team when they came to do the door. In fact, it is Cambria County Prison's cell extraction policy that one final order to comply be given to the inmate before steps are taken to physically remove the non-compliant inmate. ([ECF No. 29](#)-1 at p.25.) It appears that this did not happen in Plaintiff's situation unless it occurred before the camera started filming.

Nevertheless, a failure to comply with jail policy is of no constitutional significance in and of itself,[4] and the fact that Plaintiff professed a change of heart when the CERT team arrived does not matter. At that point, after having already refused numerous orders to cuff up, it is speculative whether Plaintiff's belated agreement to cuff up was sincere, and having already challenged prison officials' authority, it is reasonable to believe that Plaintiff posed a threat to correctional officers' safety. To allow a jury to second-guess the CERT team's actions would obviate the deference that courts must show to prison officials' professional judgment. *See* Overton v. Bazzetta, 539 U.S. 126, 132 (2003) (need for "substantial deference to the professional judgment of prison administrators"). Therefore, physical force was necessary in order to compel Plaintiff's compliance.

---

[4] Internal administrative policies and procedures in and of themselves do not create a liberty interest in that procedure. *See*, *e.g.*, Hewitt v. Helms, 459 U.S. 460, 471 (1983) (stating that the mere fact of careful procedural structure to regulate use of administrative segregation does not indicate existence of protected liberty interest); McLaurin v. Morton, 48 F.3d 944, 947 (6th Cir. 1995) (concluding that mere procedures do not create any substantive liberty interest, even when phrased in mandatory language); Culbert v. Young, 834 F.2d 624, 628 (7th Cir. 1987) (holding that the adoption of mere procedural guidelines does not give rise to a liberty interest); *cert*. *denied*, 485 U.S. 990 (1988).

### b. Relationship between the need and amount of force used

The second factor to examine is the relationship between the need and amount of force used. Although Plaintiff does not specially make this argument, his Amended Complaint seems to suggest that the need for force was nonexistent because both he and Claar were in the submissive position, lying face down on the floor in the back of the cell with their hands outstretched when the CERT team entered the cell. This argument implies that the OC spray and E-bid shield that were used during the extraction were unnecessary, and it is believed that this is Plaintiff's point of contention.

The video reveals that Officer Kupchella administered OC spray into the cell a few minutes after the CERT team arrived. Plaintiff claims that Officer Kupchella sprayed them with OC in the face, neck, back, head and arms but this allegation is belied by the video, which shows Officer Kupchella opening the cell door approximately six inches, slightly raising his arm into the cell and spraying OC in short bursts for approximately four seconds. It is clear that he does not spray the OC on either Plaintiff or Claar. The door then closes and the CERT team waits forty-five seconds before opening it again to enter.

When the door opens, five CERT team members enter and surround Plaintiff and Claar, who appear to be either sitting or lying on the floor in the far back right corner of the cell. The officers' movements are measured and calm as they surround both inmates. They are all visible and they do not hit or kick. The officers work together to handcuff the inmates and then remove them out of the cell and into the center of the block. While in the middle of the block, Plaintiff is held down by three officers in a double-leg lock position[5] while the cell is cleaned and decontaminated. Both inmates are allowed to wash their faces before they are brought back into

---

[5] The video shows that Plaintiff refused to get on the block floor so the officers used minor force to put him on the ground.

the cell and stripped of clothing. Apart from both inmates voicing their displeasure with the situation, and Plaintiff threatening the officers with a lawsuit, the video reflects nothing remarkable about the extraction.

Plaintiff seems to disagree with the use of OC spray and E-bid shield, which the record reveals was used to control Plaintiff until he was pulled out of the cell. *See* ECF No. 29-1 at p.34. However, the Third Circuit Court of Appeals has agreed that the limited use of pepper spray (aka OC spray), does not constitute cruel and unusual punishment when reasonably necessary to subdue a "recalcitrant prisoner," even when the prisoner is locked in his cell or in handcuffs. See Passmore v. Ianello, 528 F. App'x 144, 147-48 (3d Cir. 2013) (signaling agreement with their sister circuits on the limited use of pepper spray). *See also* Jones v. Shields, 207 F.3d 491, 496 (8th Cir. 2000); Soto v. Dickey, 744 F.2d 1260, 1270 (7th Cir. 1984); Baldwin v. Stalder, 137 F.3d 836, 841 (5th Cir. 1998); Williams v. Benjamin, 77 F.3d 756, 763 (4th Cir. 1996); Spain v. Procunier, 600 F.2d 189, 195-96 (9th Cir. 1979); Clemmons v. Greggs, 509 F.2d 1338, 1340 (5th Cir. 1975). In Spain, the Ninth Circuit Court of Appeals found that "the use of the substance in small amounts may be a necessary prison technique if a prisoner refuses after adequate warning to move from a cell or upon other provocation presenting a reasonable possibility that slight force will be required." 600 F.2d at 195. The court stated that in these circumstances "the substance may be a legitimate means for preventing small disturbances from becoming dangerous to other inmates or the prison personnel." Id. As to the usage of the E-bid, the Third Circuit has found its use appropriate in a situation where a pre-trial detainee refused to return to his cell after several requests and a physical struggle. *See* Baez v. Lancaster County, 487 F. App'x 30, 32 (3d Cir. 2012).

In analyzing the relationship between the need for force and the force used, the Whitley Court emphasized that simple overreaction by an officer is not enough to establish an Eighth Amendment violation:

> [I]t is obduracy and wantonness, not inadvertence or error in good faith, that characterizes the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock. The infliction of pain in the course of a prison security measure, therefore, does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense.

475 U.S. at 319. Thus, it is "malicious and sadistic force," not merely "objectively unreasonable force," that is needed to establish a violation.[6]

In the Court's opinion, the video leaves no doubt that the extraction was conducted "in a good-faith effort to maintain or restore discipline," and not "maliciously and sadistically to cause harm." *See* Scott, 127 S. Ct. at 380-81 (facts on summary judgment must be viewed in the light recorded by the videotape). *See also* Walker v. Kemna, 2011 WL 5374567 (W.D. Mo. Nov. 4, 2011) (holding an officer's pepper spray of inmate in a closed locked cell was reasonable when the inmate refused orders to ready himself for transport from the cell); Giles v. Kearney, 516 F.Supp.2d 362, 368-69 (D. Del. 2007) (use of pepper spray against an inmate was justified in response to the inmate's defiant and argumentative behavior, as well as his repeated refusals to obey orders); Whitfield v. Walker, 2007 WL 2769658 (C.D. Ill. Sept. 19, 2007) (cell extraction involving use of pepper spray on inmate who refused orders to cuff up and made threats to staff was not "malicious and sadistic" even though the inmate finally agreed to cuff up prior to the

---

[6] The Supreme Court rejected a post-hoc reasonableness approach that would deem acts as cruel and unusual punishment due to the fact that they appear to have been unnecessary in hindsight. Whitley, 475 U.S. at 319.

14

extraction). Therefore, the relationship between the need for force and the amount of force used is found to be appropriate.

### c. Extent of injury inflicted

Plaintiff claims that he suffered bruising and swelling on his head and face as a result of being held down on the concrete floor. However, the nurse who examined Plaintiff after the extraction found no visible bruises, and Plaintiff's medical records reveal no complaints or treatment for any injuries related to the July 20, 2014 incident. *See* [ECF No. 29-1 at pp.56-64](). Additionally, Plaintiff's claim of "irreparable injury" in his Amended Complaint is not supported by any factual allegations apart from his claim of general pain and suffering, and there is no evidence in the record that he suffered any injuries as a result of the cell extraction except for the temporary pain caused by the use of the OC spray. Even though there is no actual evidence of injury, assuming Plaintiff did suffer some bruising and swelling, these injuries are *di minimis* in nature, and while this does not imply *di minimis* force under the law, *see* Smith v. Mesinger, 293 F.3d 641, 648-49 (3d Cir. 2002), the force used in this case, as established by the videotape evidence, does not rise beyond such level.

### d. Extent of threat to safety of staff and inmates

In reviewing "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them," the Whitley Court cautioned that courts should be mindful that "prison officials must take into account the very real threats the unrest presents to inmates and prison officials alike" in making and carrying out decisions involving the use of force to restore order. 475 U.S. at 320-21. In addition, "[d]espite the weight of these competing concerns, corrections officers must make their decisions

15

in haste, under pressure, and frequently without the luxury of a second chance." Hudson, 503 U.S. at 6 (citing Whitley, 475 U.S. at 320).

Here, two inmates housed in the restrictive housing unit were unambiguously choosing not to follow orders that pertained to prison security, thus disrupting the prison's daily operations. If the operations of a prison are disturbed, there is the potential for great risk to the safety of all involved.

### e. **Efforts to temper severity of forceful response**

Finally, before any amount of force was used, prison staff used numerous verbal commands to get Plaintiff and Claar to submit to handcuffs, and force was employed only after they refused to comply with those orders. The evidence does not support the conclusion that force was the first option used by corrections officials.

### f. **Conclusion**

As instructed by the Supreme Court, "[u]nless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under the standard we have described, the case should not go to the jury." Whitley, 475 U.S. at 321-22.

After a complete screening of the entire video evidence of record, and examining the circumstances of this case under the appropriate factors, including viewing the videotape in the light most favorable to Plaintiff, the Court finds no genuine issue of fact to justify continuing the case to trial because the force applied on Plaintiff was not unconstitutionally excessive. Consequently, Defendants are entitled to summary judgment on this claim.

### 5. **Claims against Defendants in their Official Capacity**

Plaintiff sues Defendants in their official capacity, and in such instances, the claim is an action against the governmental entity they represent, which, in this case, is Cambria County. *See* Kentucky v. Graham, 473 U.S. 159, 165-66 (1985) (holding that suing a party in his or her official capacity is not a suit against the official, but rather is a suit against the official's office, and is no different from a suit against the entity itself); *see also* Will v. Michigan Department of State Police, 491 U.S. 58, 71 (1989).

"Before a local government can be held liable for injuries pursuant to § 1983, whether the suit is plead as an official capacity suit or a suit against the local government, a plaintiff must show that his injuries were the result of a 'policy or custom' attributable to the governmental entity." Monell v. Dept. of Social Services, 436 U.S. 658, 690 (1978). Municipal liability for the actions of its employees may not be predicated on a theory of *respondeat superior*. Id. at 691.

Plaintiff does not identify any policy or custom attributable to Cambria County that is responsible for the alleged constitutional violations. Nevertheless, if a municipal employee "inflicted no constitutional injury . . . , it is inconceivable that [the municipality] could be liable." Mullholland v. Gov't County of Berks, 706 F.3d 227, 244 n.23 (3d Cir. 2013) ("Plaintiff must establish an underlying constitutional violation to attribute liability to the County pursuant to Monell . . ."). In other words, since there was no constitutional violation committed by any of the Defendants in this action, there can be no liability against Cambria County. Therefore, Defendants are entitled to summary judgment as they are sued in their official capacities.

Defendants' Motion for Summary Judgment ([ECF No. 29](#)) will be granted. A separate Order will follow.

Dated: December 14, 2015.

_____
Lisa Pupo Lenihan
United States Magistrate Judge

cc: (Via First Class U.S. Mail)
Robert Clair Cochran
JY-5976
301 Washington Street
Johnstown, PA 15901

(Via CM/ECF Electronic Mail)
Counsel of Record

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT CLAIR COCHRAN, | ) | |
| | ) | Civil Action No. 14 – 199J |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Lisa Pupo Lenihan |
| | ) | |
| GREGORY KUPCHELLA, | ) | |
| *Corrections Officer/Cert Leader*, | ) | ECF No. 29 |
| JOHN PREBISH, JR., *Warden*, and | ) | |
| LIAM ANDERSON, *Corrections* | ) | |
| *Officer/Cert Team*, | ) | |
| | ) | |
| Defendants. | ) | |

## **ORDER**

**AND NOW** this 14th day of December, 2015, in accordance with the Memorandum Opinion issued contemporaneously herewith,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 29) is GRANTED.  Judgment shall be entered in favor of Defendants and against Plaintiff.

**IT IS FURTHER ORDERED** that the Clerk of Court shall mark this case **CLOSED**.

**AND IT IS FURTHER ORDERED** that, pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, if any party wishes to appeal from this Order a notice of appeal, as provided in Fed. R. App. P. 3, must be filed with the Clerk of Court, United States District Court, at 700 Grant Street, Room 3110, Pittsburgh, PA 15219, within thirty (30) days.

_____
Lisa Pupo Lenihan
United States Magistrate Judge

cc:  (Via First Class U.S. Mail)

Robert Clair Cochran
JY-5976
301 Washington Street
Johnstown, PA 15901

(Via CM/ECF Electronic Mail)
Counsel of Record